**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MICHELLE VOIROL**
Elkhart, Indiana

ATTORNEY FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW R. FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DUSTIN L. BESS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A04-1112-CR-701 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Stephen R. Bowers, Judge
Cause No. 20D02-1104-FA-4

**August 7, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

Appellant-Defendant Dustin Bess appeals from the forty-five-year sentence imposed following his conviction for Class A felony Burglary.[1] Bess contends that the trial court abused its discretion in sentencing him and that his sentence is inappropriately harsh. We affirm.

## FACTS AND PROCEDURAL HISTORY

In early November of 2010, Josh Melvin resided in a shed behind the mobile home of Dustin and Brittni Irwin, which was located in Bristol Mobile Village in Elkhart County. At some point, Melvin, Bess, Michael Kuhn, and Robert Ritchie met in the shed, where they "would play video games, smoke weed, [and] hang out[,]" and planned a burglary of Trenna Ritchie's trailer, which was also located in the Bristol Mobile Village. Tr. p. 76. According to the plan, Kuhn was to stay outside as lookout while Bess and Ritchie (who was Trenna's ex-stepson) would enter the trailer, bind Trenna and her fifteen-year-old son Phillip Hensley, and steal certain items.

At approximately 2:00 a.m. on November 9, 2010, Bess, Ritchie, and Kuhn went to Trenna's trailer to carry out their plan. Bess was wearing two handkerchiefs on his head, while Ritchie was wearing a ski mask bearing an image of The Incredible Hulk. Trenna awoke to find Bess and Ritchie standing over her in her bed. As the duo spoke, Trenna recognized Ritchie from his voice, and when she asked him "why they were doing this … they said [she] had shit that they wanted." Tr. p. 207. The duo attempted to bind Trenna with a dog leash, and when they failed, they began punching and kicking her in the face and

---

[1] Ind. Code § 35-43-2-1(2) (2010).

ribs. While the duo was disconnecting Trenna's television, she attempted to call 911. One of the invaders, however, heard Trenna, returned to her bedroom, knocked her down, and took her telephone. As a result of the attack, Trenna experienced extreme pain, suffered fractured ribs, and was ultimately required to have reconstructive surgery on her "caved in" nose. Tr. p. 210. At some point, one of the invaders went to Hensley's room, "jumped on [him,] and punched [him] four times in the face[,]" causing bruising. Tr. p. 200. The trio left Trenna's home with her new television, which Kuhn later traded for two ounces of marijuana.

On April 6, 2011, the State charged Bess with Class A felony burglary causing bodily injury and Class C felony battery causing serious bodily injury. On November 16, 2011, a jury found Bess guilty of Class A felony burglary. On December 12, 2011, the trial court sentenced Bess to forty-five years of incarceration. The trial court found several aggravating circumstances: the effect of Bess's crime on Trenna, his criminal history, that the damage caused was far worse than necessary to constitute the crime of Class A felony burglary, that the attacks on Trenna and Hensley were unnecessary, and his behavior in jail awaiting trial. The trial court found Bess's youth (he was nineteen at the time of the burglary) and difficult childhood to be mitigating circumstances.

## DISCUSSION AND DECISION

### I. Whether the Trial Court Abused its Discretion in Sentencing Bess

Under our current sentencing scheme, "the trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular sentence." *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *modified on other grounds on reh'g*, 875 N.E.2d

3

218 (Ind. 2008). We review the sentence for an abuse of discretion. *Id*. An abuse of discretion occurs if "the decision is clearly against the logic and effect of the facts and circumstances." *Id*.

A trial court abuses its discretion if it (1) fails "to enter a sentencing statement at all[,]" (2) enters "a sentencing statement that explains reasons for imposing a sentence–including a finding of aggravating and mitigating factors if any–but the record does not support the reasons," (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration," or (4) considers reasons that "are improper as a matter of law." *Id*. at 490-91. If the trial court has abused its discretion, we will remand for resentencing "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id*. at 491. However, under the new statutory scheme, the relative weight or value assignable to reasons properly found, or to those which should have been found, is not subject to review for abuse of discretion. *Id*.

Bess contends that the trial court abused its discretion in finding several of the aggravating circumstances instead of submitting the question to the jury. Addressing Indiana's "presumptive" sentencing scheme, the Indiana Supreme has held as follows:

> The Court in *Apprendi v. New Jersey* declared that "other than the fact of prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). As clarified in *Blakely*, the statutory maximum of which the Court spoke was "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely* [*v. Washington*], 542 U.S. [296, 303], 124 S.Ct. [2531 ,]2537 [(2004)]. We

4

recently held that *Blakely* was applicable to Indiana's sentencing scheme because our presumptive term constituted the statutory maximum as defined in *Blakely*. *Smylie v. State*, 823 N.E.2d 679, 683 (Ind. 2005). Consequently, we held that to enhance a sentence under Indiana' then existing system "the sort of facts envisioned by *Blakely* as necessitating a jury finding must be found by a jury...." *Id*. at 686.

*Trusley v. State*, 829 N.E.2d 923, 925 (Ind. 2005).

Bess, however, is to be sentenced according to the scheme in effect at that time he committed his crimes, *Robertson v. State*, 871 N.E.2d 280, 284 (Ind. 2007), and the scheme in place in November of 2010 was Indiana's "advisory" scheme, which supplanted the "presumptive" scheme on April 25, 2005. *Edrington v. State*, 909 N.E.2d 1093, 1096 n.2 (Ind. Ct. App. 2009). The holdings of *Blakely* and *Smylie* no longer apply to Indiana's sentencing scheme, and to the extent that Bess's argument depends on his contention that they do, we reject it. That said, Bess also contends that the trial court abused its discretion in finding some aggravating circumstances without regard to *Blakely*.

### A. Criminal History

Bess argues that the trial court improperly found his criminal history of prior convictions and juvenile adjudications to be an aggravating circumstance. Prior convictions may be considered to have significant aggravating weight depending on the circumstances of the case. *Waldon v. State*, 829 N.E.2d 168, 182 (Ind. Ct. App. 2005) (citing *Westmoreland v. State*, 787 N.E.2d 1005, 1010 (Ind. Ct. App. 2003)), *reh'g denied, trans. denied*. "The significance afforded to a defendant's criminal history depends upon the gravity, nature, and number of the prior offenses as they relate to the current offense." *Id*. (citing *Ballard v.*

5

*State*, 808 N.E.2d 729, 736 (Ind. Ct. App. 2004), *trans. granted, aff'd in relevant part*, *Ballard v. State*, 812 N.E.2d 789 (Ind. 2004)).

We cannot agree that the trial court abused its discretion in this regard. Bess, born March 11, 1991, was adjudged on September 16, 2005, to have committed what would be, if committed by an adult, Class A misdemeanor battery and placed on probation, probation from which he was later dishonorably discharged. Also on September 16, 2005, Bess admitted to committing what would be, if committed by an adult, another count of Class A misdemeanor battery and Class A misdemeanor criminal mischief.[2] On December 6, 2005, Bess admitted to committing what would be, if committed by an adult, two counts of Class A misdemeanor battery and one count of Class B misdemeanor battery, and the juvenile court ordered Bess committed to the Department of Correction. As an adult, Bess has a February 17, 2011, conviction for Class A misdemeanor fleeing a police officer.

Bess's first juvenile adjudication for a violent offense came when he was fourteen, and, before turning twenty, he had accumulated five more prior juvenile adjudications and one prior adult criminal conviction. Bess's criminal history shows him to have a long-standing tendency toward violence, which is clearly relevant to his instant conviction, also involving violence. This case is easily distinguishable from cases such as *Wooley v. State*, 716 N.E.2d 919 (Ind. 1999), due to the number of convictions and adjudications and their relationship to Bess's instant conviction. *See id.* at 929 ("We conclude that, in this case, a

---

[2] The juvenile court appears not to have ordered separate detention or probation resulting from these adjudications.

6

criminal history comprised of a single, nonviolent misdemeanor is not a significant aggravator in the context of a sentence for murder.") (footnote omitted). The trial court did not abuse its discretion in this regard.

**B. Damage Done was Greater than Necessary to Prove the Crime**

Bess also contends that the trial court abused its discretion in enhancing his sentence on the basis that the damage done was worse than necessary to prove Class A felony burglary causing bodily injury. Bess's argument is premised on his contentions that (a) the jury acquitted him of battery causing serious bodily injury on the basis that it found that Trenna's and Hensley's injuries constituted bodily injury but not serious bodily injury and (b) the trial court's finding in this regard amounts to a finding that he caused serious bodily injury. So, the argument goes, the trial court, in finding this aggravating circumstance, is punishing him for something the jury found did not occur. Bess's argument, however, fails because, at the very least, premise (b) is incorrect.

First, there were two persons injured as a result of Bess's burglary, when only one would have sustained his class A felony conviction. Indiana Code section 35-43-2-1 provides in relevant part that "[a] person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary, … a Class A felony if it results in … bodily injury … to any person other than a defendant."

Second, it is entirely possible to have bodily injury that, while more severe than some other bodily injuries, does not reach the level of "serious bodily injury." The relevant statues indicate that the threshold for proving "bodily injury" is quite low while for proving "serious

7

bodily injury" it is quite high, which means that there is a lot of middle ground. "'Bodily injury' means any impairment of physical condition, including physical pain[,]" whereas "'[s]erious bodily injury' means bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus." Ind. Code §§ 35-31.5-2-29 (2012);[3] -292(2012).[4] Although Trenna and Hensley clearly could have been found to have suffered bodily injury, there was no evidence of substantial risk of death, serious permanent disfigurement, unconsciousness, permanent or protracted loss or impairment of the function of a bodily member or organ, or loss of a fetus. Moreover, the jury was free to find that although Trenna and Hensley felt pain, perhaps even great pain, is was nonetheless not "extreme" pain. The trial court's finding that the damage was greater than necessary to prove Class A felony burglary was an aggravating circumstance did not constitute an abuse of discretion.

## C. Bess's Decision to Stand Trial

Bess contends that the trial court improperly found his decision to stand trial to be an aggravating circumstance. The record does not support this assertion. Rather, the context of comments regarding Bess's decision to stand trial indicate that the trial court was merely observing that it could not find a guilty plea to be mitigating because Bess never entered one: "I looked very had to find mitigating circumstances here You didn't plead guilty. That – you

---

[3] Formerly Indiana Code section 35-41-1-4 (2010).

[4] Formerly Indiana Code section 35-41-1-25 (2010).

insisted on going to trial on this case when your guilt was quite obvious and where there was overwhelming evidence against you so, that certainly not a mitigator." At most, this comment indicates that the trial court would have at least considered a guilty plea to be a mitigating circumstance, had one been entered. The trial court did not abuse its discretion in sentencing Bess.

## II. Whether Bess's Sentence is Inappropriate

We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). In addition to the "due consideration" we are required to give to the trial court's sentencing decision, "we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). As previously mentioned, the trial court sentenced Bess to forty-five years of incarceration, out of a possible maximum of fifty.

9

The nature of Bess's offense was egregious, a premeditated burglary of a dwelling known to be occupied at the time involving completely gratuitous violence. Kuhn, Ritchie, and Bess planned to invade Trenna's home, bind her and Hensley, and take several items. When Ritchie and Bess found themselves unable to bind Trenna, they severely beat her instead. Trenna required reconstructive surgery on her nose and suffered fractured ribs. When Trenna attempted to call 911, she was knocked over and her telephone taken. Trenna also suffered severe emotional scarring. During her testimony at trial, the court reporter observed her "start to whimper, cry, and tremble" and "whimper[] and cry[] loudly[,]" and the trial court observed that he had "rarely seen a victim respond with as much fear as [Trenna] did[.]" Tr. pp. 212, 213, 291. As of sentencing, Trenna was still having nightmares caused by the burglary. The duo did not even attempt to bind Hensley before one of them began beating him in the face while he was still asleep. The nature of Bess's offenses justifies an enhanced sentence.

As for Bess's character, the record indicates that it is poor, with a strong tendency toward violence. As previously detailed, Bess, although only nineteen when he committed the instant crime, had already amassed a somewhat lengthy juvenile and criminal record, mostly for acts of violence. Bess's presentencing behavior in jail was also quite disturbing, to say the least. On July 18, 2011, Bess became engaged in a confrontation with an Officer Ducret, which apparently began when Bess crossed over into an unauthorized area. When told that he should not have crossed the "red line," Bess responded with a violent and profane tirade directed at Officer Ducret. The encounter continued in a similar vein for some time,

10

with Officer Ducret eventually taking Bess to the ground when he attempted to "turn on" the officer. Appellant's App. p. 253. Officers managed to subdue Bess only after they threatened him with a taser. Bess received sixty days of disciplinary segregation for the incident.

On August 19, 2011, Bess was involved in a fight with another inmate, which resulted in the other inmate suffering a bite mark on his right hand, numerous scratches, and profuse bleeding. Bess received an additional thirty days of disciplinary segregation. On September 17, 2011, Bess was caught passing an unauthorized note to another inmate, for which he received ten days of disciplinary segregation.

On October 7, 2011, Bess and another inmate clogged the toilet in their cell, causing a flood. After Bess was moved to a classroom due to the flooding, he was watched by Officer Danny Fleming. According to Officer Fleming,

> While in the room with [Bess] he continuously threatened me saying that he was going to be coming for me when he got out and that he was going to crash me and smash me. He said he wished he could get a hold of me now so he could choke the life out of me. He stated that if he ever got to min/med or if I was ever doing head count in K-pod he would surprise attack me and stomp me and put me in the hospital. He stated that he was going to find where I live and sexually assault my wife, kill her and slit my child's throat. He also stated that if he see[s] me on the outside he was going to kill me.

Appellant's App. p. 236. Bess also told officers that he would "get one of you when you are doing a walkthrough. Pick up a broom and smash you on the back of your f****** head. I might even push one of you down the stairs on a walkthrough." Appellant's App. p. 252. As a result of this incident, Bess received forth-five days of disciplinary segregation.

11

Finally, on November 6, 2011, Bess and another inmate attacked a third inmate, Randall Sullivan. Sullivan reported that Bess and the other inmate "jumped [him] with the broom[,]" causing a lip laceration that required stitches, a lump on the back of his head "approximately the size of a baseball[,]" and a red and swollen eye. Appellant's App. pp. 230, 234. Bess's behavior in jail indicates a lack of respect for authority and willingness to resort to violence and threats that is, in a word, appalling.

It is also worth noting that an Indiana Risk Assessment System evaluation was performed during the preparation of Bess's presentence investigation report, and his risk level for recidivism was found to be thirty-three, or "high." The trial court noted that Bess's risk level was "one of the highest [he had] ever seen for anyone at any age and which appears, if anything, to underestimate the risk [Bess] present[s]." Tr. p. 296. Bess's criminal history, his behavior in jail, and his high risk of recidivism indicate that his character is poor, which, along with the egregious nature of his offense, fully justifies his forty-five-year sentence. Bess has failed to establish that his sentence is inappropriate.

We affirm the judgment of the trial court.

ROBB, C.J., and BAKER, J., concur.